STATE of Minnesota, Petitioner,
Appellant,

v.

Jason Alan OSTREM, Respondent.

No. C0–94–56.

Supreme Court of Minnesota.

Aug. 18, 1995.

Hubert H. Humphrey, III, Atty. Gen., Cheryl W. Heilman, Asst. Atty. Gen., St. Paul, and Kenneth Kohler, Nobles County Atty., Worthington, for appellant.

Timothy R. Anderson, Frederic Bruno & Associates, Minneapolis, for respondent.

## OPINION

GARDEBRING, Justice.

In December 1992, Jason Alan Ostrem was charged with second-degree burglary and theft. In October 1993, Ostrem was convicted of aiding and abetting second-degree burglary and aiding and abetting theft. *See* Minn.Stat. § 609.582, subd. 2(a) (1994); Minn.Stat. § 609.52, subd. 2(1) (1994); Minn. Stat. § 609.05 (1994). The court of appeals reversed Ostrem's conviction on three grounds: 1) denial of due process resulting from a single-photo identification process; 2) impermissible appearance of partiality resulting from the trial court's instruction on aiding and abetting; and 3) insufficient evidence to sustain the convictions. *State v. Ostrem,* 520 N.W.2d 426 (Minn.App.1994), *pet. for rev. granted* (Minn., Oct. 27, 1994). The state appeals and, in accordance with our reasoning below, we reverse.

The record reflects the following facts. Between 8:30 a.m. and 11 a.m. on November 22, 1992, Ardella and Ralph Schroeder's farmhouse, located off a lightly travelled

gravel road in a rural area near Worthington, was burglarized. The Schroeders left their home at approximately 8:30 a.m. When they returned, between 11 a.m. and 11:30 a.m., the door was still locked, but they noticed that the bathroom blinds and a rug were out of place and a jar of change was open. Ardella Schroeder then noticed the safe door was ajar and $6,300 in cash, mainly in denominations of $50 and $100 bills, was missing.

The Schroeder's son Kevin and his family live approximately 1½ miles up the road. On the morning of the burglary, Kevin Schroeder and his family drove past his parents' house at approximately 8:45 a.m. As he drove by, he noticed a 1972 or 1973 black Dodge Charger with mag-rimmed wheels parked on the side of the gravel road approximately 100 yards from his parents' house. The car was empty and showed no signs of trouble, but he noticed two men standing on the front deck of the house. Kevin Schroeder drove into the yard to ask if they needed any help. There was contradictory testimony concerning the location of the discussion between Kevin Schroeder and the two men. During the omnibus hearing, one of the investigating officers testified that "[Kevin Schroeder] talked to one of them, and the other one stood back on the deck of the house * * * on the south side of the house * * *." However, at trial, Rodney Boomgaarden, who admitted being present at the scene, testified that Kevin Schroeder approached the two men on the deck. On direct examination, Kevin Schroeder testified that he approached the two men on the deck; however, during cross-examination he indicated he did not get out of the car, but rather the two men walked over to the side of his car.

One of the men, later identified as Boomgaarden, told Kevin Schroeder that the car had overheated and that they wanted to use the telephone.[1] Although Boomgaarden testified that he saw oil leaking from the car, neither Kevin Schroeder nor the investigating officers reported any evidence of an oil leak. Kevin Schroeder offered the men a

ride into town, but they refused. Boomgaarden told Kevin Schroeder that his sister knew they were having trouble and he just wanted to call her to be sure she was on her way. Kevin Schroeder again offered them a ride, but they said they would "limp" the car into town. As he drove out of the yard, Kevin Schroeder saw the two men walk toward the black Charger, but did not actually see them get in the car.

At approximately 11:30 a.m., Kevin Schroeder received a telephone call from his mother who told him some money was missing from the safe. He told his mother about the two men on the deck. Ardella Schroeder called the sheriff to report the incident. Deputy Sheriff Kenneth Thompson went to the Schroeder farmhouse in response to the call.

Kevin Schroeder described to Deputy Thompson the men he had seen as both being white, in their twenties, weighing about 140 pounds and standing about 6 feet or a little taller. He also described one of the men, later positively identified as Boomgaarden, as having a mustache and wearing a black ski jacket, a cap, black dockers and white cotton gloves. Kevin Schroeder described the other man as having long hair, wearing glasses, a cap, a hooded sweatshirt, and high-top tennis shoes with multicolored shoe strings. Deputy Thompson inspected the farmhouse and found that a window screen in the back of the house had been slit and there were dirty smudges on the window pane where it had been pushed up. Deputy Thompson and Kevin Schroeder also saw what appeared to be two sets of footprints in the frost which led from the front deck toward the road near where the car was parked, and another set that led from the road toward the back of the house near the window that had been slit. Deputy Thompson recalled seeing a black Charger at Graham Tire in Worthington. Kevin Schroeder called a friend who worked there and was told Boomgaarden owned the car.

On November 23, 1992, Kevin Schroeder went into the police station to view a photographic line-up, and from the display of pic-

---

1. At trial, Boomgaarden testified that the car "just quit" outside the Schroeders' residence because a rear seal in the engine had blown out and caused the oil to leak out. On direct examination, Boomgaarden stated that he saw oil that had leaked from the car.

tures, he identified Boomgaarden as one of the men he met at his parents' home the morning of the crime. On November 24, 1993, police officers saw Boomgaarden at the wheel of a black Charger parked behind a store in Worthington. At the request of one of the officers, Boomgaarden emptied his pockets and allowed the officers to search his car, including the trunk. The officers found Boomgaarden in possession of a baggie containing $1,650 cash in $100 and $50 bills, as well as $189 in a new billfold. They also found several new purchases in the trunk, including new stereo speakers. Two passengers in the car were identified as Todd Weyker and Jennifer Evenson, Weyker's girlfriend. Weyker had $500 in $50 bills in his pockets. Weyker and Boomgaarden were placed in separate police cars. When one of the officers asked about the large sum of cash, Boomgaarden said $230 came from his last paycheck and $23 was from his savings account. Boomgaarden was unable to explain the rest of the money.[2] Boomgaarden also initially denied that his car had any mechanical problems within the past month and stated that he had not been at the Schroeders' residence. Eventually, Boomgaarden told the officer he had "forgotten" about his car breaking down and then admitted to being at the Schroeders' farmhouse with Weyker.

Later in the day on November 24, 1993, Ostrem took Jennifer Evenson, who was a friend of his wife, to the police station to pick up Weyker's house keys. One of the records clerks notified Deputy Thompson that the man with Evenson closely resembled the description in the police report of the second man on the Schroeders' deck. Deputy Thompson told Ostrem that he fit the description of a person suspected of burglary and asked if he could take a photo of Ostrem's face and shoes. Ostrem was wearing high-top tennis shoes with multicolored fluorescent shoe laces. Ostrem consented to having his pictures taken. The photograph of Ostrem depicts a white man with long brown hair, wearing eyeglasses and a cap. The photograph of the shoes depicts high-top tennis shoes with multicolored shoe laces.

After Ostrem left the station, Deputy Thompson put the photos on his desk and called Kevin Schroeder to ask him to come into the station to look at a photographic line-up concerning the second suspect. Approximately 15 minutes later, Kevin Schroeder and his wife arrived at the police station and were met in the lobby by Deputy Thompson. As soon as the three of them entered Deputy Thompson's office, Kevin Schroeder and his wife saw the photo of Ostrem on the desk and said, "[T]here's the second guy. There's the other guy that was on the deck." Deputy Thompson did not prompt or request Kevin Schroeder to look at the photo of Ostrem on the desk. In fact, Deputy Thompson testified that he had planned on presenting the photos differently, but Kevin Schroeder identified Ostrem's photograph on his desk before he had an opportunity to properly arrange the lineup. Ostrem, Weyker and Boomgaarden were charged with second-degree burglary and theft.

The defense's pretrial motions to dismiss and to suppress the photo identification evidence were denied. At the omnibus hearing, the court found the single photo identification procedure was unnecessarily suggestive but, based on Kevin Schroeder's level of certainty, his opportunity to view Ostrem at the time of the crime and his accurate description to the police officer, the court did not suppress the photo identification.

At trial, the state's theory was that when Kevin Schroeder drove up to the farmhouse, Ostrem and Boomgaarden were on the deck while Weyker was already in the house or at the back of the house where the window screen had been slit. In support of its theory, the state introduced evidence that the three men were friends. Boomgaarden testified that he and Weyker were at the Schroeders' farmhouse on the morning of the burglary, that he owned the black Charger, that they had stopped at the farmhouse because of car trouble, that Ostrem was not with them, and that they did not commit the burglary and theft. The state also intro-

**2.** At trial, Boomgaarden testified that the $1,650 in cash was money he was hiding from the

Family Services agency to avoid paying child support.

duced a note from Boomgaarden to Weyker that was intercepted by a jailer while both were in custody in jail, prior to Ostrem's arrest.[3] Boomgaarden also testified that he had a police record of prior offenses, which includes conspiracy to commit burglary in 1988, five third-degree burglary counts in 1989, and a felony escape from custody in 1989. The state's case was also supported by testimony from Kevin Schroeder, who made a positive in-court identification of both Ostrem and Boomgaarden. When asked to look at a photograph of Weyker to determine if he could have been the second man on the deck, Kevin Schroeder stated that he had no doubt in his mind that Ostrem was the man he saw, and not Weyker. Deputy Thompson also testified about the description Kevin Schroeder gave him of the two men on the day of the burglary and Kevin Schroeder's positive photo identification of both Boomgaarden and Ostrem.

Ostrem testified that he was not with Boomgaarden and Weyker on the day of the burglary, but was home with his wife all weekend. Ostrem testified that he knew who Boomgaarden was and had been friends with Weyker for a couple of years. Weyker's girlfriend was the best friend of Ostrem's wife and the four of them socialized occasionally. He also confirmed that he owned the glasses and shoes that he was wearing when the police took the photographs. To corroborate his alibi defense, Ostrem offered testimony from his sister. She testified that she called Ostrem at approximately 10:30 a.m. at home on the day of the burglary and he answered the telephone. Ostrem's wife was expected to testify as an alibi witness, but she did not.

At the close of evidence, the trial court held a hearing in chambers to discuss jury instructions. The trial court told the attorneys that it had concluded, as a matter of law, that the state had not presented sufficient evidence to submit the burglary and theft charges in the complaint, but that the court intended to submit the charges under an aiding and abetting theory. The trial court recognized that Ostrem had not been charged with aiding and abetting, but it determined such an instruction did not prejudice him because he was sufficiently put on notice by the burglary and theft charges. Furthermore, the trial court concluded:

> In the Court's opinion there is no witness that either side, or that the state failed to call that the Defendant might have called to change the evidence available. In other words, I do not believe it's prejudicial to the Defendant to submit the aiding and abetting charges to the jury in light of his theory of the case and in the absence of any persuasive argument that to do so would be prejudicial.

Ostrem's counsel objected to the court's decision to give the aiding and abetting instruction, indicating that such an instruction put the defense at a strategic disadvantage. However, the trial court concluded:

> It doesn't change the State's theory of the case. The State doesn't know whether one or two or three people entered the house. * * * Circumstantially the State has presented evidence that this was a burglary. Circumstantially the State has presented evidence that the Defendant was present at the time. * * * I don't know what other evidence anybody could have presented knowing three days ago that the matter would be submitted to the jury under 609.05, aiding and abetting the theft and the burglary. * * * There were no more people around. It's the same crime that is being discussed.

The trial court instructed the jury that Ostrem could be found guilty if he aided and abetted the commission of a burglary or

3. The note in part stated:
> You didn't tell the cops that we were in that f--kin' place did you? [T]hat's just what they told me * * *. They told me that they had the serial numbers to our money. [T]hat's a f--kin' lie and a half. I kept hounding their ass about getting those numbers and matching them up but they kept feeding me a bunch of lines * * *. That's cool that Jenny didn't say anything. They couldn't get anything out of my ass I just more or less told them to kiss my ass. I did tell them that we were at the place to use a phone because my car overheated, and that I was going to call one of my sisters but that was it—Hey Homey write back as soon as possible and let me know what you said, so our stories don't get f--ked up. * * * PS I told you we shouldn't have pulled in that f--kin place * * *.

theft. The court also gave a jury instruction on the elements of second-degree burglary and theft.[4] After deliberating for almost three hours, the jury returned guilty verdicts of aiding and abetting second-degree burglary and aiding and abetting theft.

The first issue we address is whether the pretrial identification procedure was impermissibly suggestive in violation of Ostrem's due process rights. In determining whether pretrial eyewitness identification evidence must be suppressed, a two-part test is applied. *Simmons v. United States,* 390 U.S. 377, 381, 88 S.Ct. 967, 969–70, 19 L.Ed.2d 1247 (1968); *State v. Marhoun,* 323 N.W.2d 729 (Minn.1982). The first inquiry focuses on whether the procedure was unnecessarily suggestive. *Marhoun* 323 N.W.2d at 733. Whether a pretrial identification procedure is unnecessarily suggestive turns on whether the defendant was unfairly singled out for identification. *Simmons,* 390 U.S. at 383, 88 S.Ct. at 970–71. Single photo line-up identification procedures have been widely condemned as unnecessarily suggestive. *Id.; Manson v. Brathwaite,* 432 U.S. 98, 104, 97 S.Ct. 2243, 2247–48, 53 L.Ed.2d 140 (1977). However, under the second prong of the test, the identification evidence, even if suggestive, may be admissible if the totality of the circumstances establishes that the evidence

was reliable. *Manson,* 432 U.S. at 116, 97 S.Ct. at 2253–54; *State v. Bellcourt,* 312 Minn. 263, 251 N.W.2d 631, 633 (1977). If the totality of the circumstances shows the witness' identification has adequate independent origin, it is considered to be reliable despite the suggestive procedure. *Manson,* 432 U.S. at 116, 97 S.Ct. at 2253–54; *Bellcourt,* 251 N.W.2d at 633. The test is whether the suggestive procedures created a very substantial likelihood of irreparable misidentification. *Id.* In *Bellcourt* we adopted the five factors articulated by the United States Supreme Court to evaluate in considering the totality of the circumstances as articulated:

1. The opportunity of the witness to view the criminal at the time of the crime;

2. The witness' degree of attention;

3. The accuracy of the witness' prior description of the criminal;

4. The level of certainty demonstrated by the witness at the photo display;

5. The time between the crime and the confrontation.

*Bellcourt,* 251 N.W.2d at 633 (citing *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)).

We may presume that in the present case the procedure was unnecessarily suggestive, as did the trial court. However, we conclude

---

4. The trial court gave the following jury instructions concerning circumstantial evidence, aiding and abetting, second-degree burglary, and theft:

A fact is proved by circumstantial evidence when its existence can be reasonably inferred from the other facts proved in the case. Before a person can be found guilty on circumstantial evidence alone you must find that the circumstantial evidence, taken as a whole, is consistent with guilt and inconsistent with any other rational conclusion.

\* \* \* \* \* \*

Now, a Defendant is guilty of a crime committed by another person when the Defendant has intentionally aided the other person in committing it, or has intentionally advised, hired, counseled, conspired with or otherwise procured the person to commit it. A Defendant intentionally aids and abets another in committing a crime where the Defendant played some knowing role in the commission of the crime and takes no steps to thwart its commission. Active participation in the overt act constituting the crime is not necessary for a Defendant to be guilty of a crime committed by another. The intent to aid and abet another in commit-

ting a crime may be inferred from circumstantial evidence, including Defendant's presence, companionship and conduct before, during and after the commission of the crime. Defendant is guilty of a crime however only if the other person commits a crime. Defendant is not liable criminally for aiding, advising, hiring, counseling, conspiring or otherwise procuring the commission of a crime unless some crime, including an attempt is actually committed.

\* \* \* \* \* \*

Burglary in the second degree. The statutes of Minnesota provide: That whoever with intent to commit a crime therein enters a building without the consent of the person in lawful possession is guilty of burglary in the second degree if the building is a dwelling.

\* \* \* \* \* \*

Now, with respect to the crime of theft. The statutes of Minnesota provide that whoever intentionally takes, and without claim of right takes possession of movable property of another without the others consent, and with intent to permanently deprive the owner of possession of the property is guilty of theft.

that the identification is nonetheless admissible because application of the *Bellcourt* factors supports a conclusion that the evidence is reliable: Kevin Schroeder had an opportunity to see Ostrem during daylight hours from relatively close range at the farmhouse; his attention was focused on the two men on the farmhouse deck and he carried on a conversation with one of the men; his description of Ostrem given to Deputy Thompson was detailed and accurate; his identification of Ostrem from the photo was instantaneous and unprovoked, and his identification of Ostrem's photo was only 48 hours after the crime. As a result, the out-of-court photo identification of Ostrem was properly admitted because it was reliable evidence under the totality of the circumstances test.

■ Next, we address whether the trial court committed reversible error by submitting the case to the jury under an aiding and abetting theory even though the complaint charging Ostrem with second-degree burglary and theft did not cite the aiding and abetting statute.[5] Ostrem contends that the trial court did not have the authority to *sua sponte* "amend" the complaint after trial had begun, and alternatively that even if the court had such authority, in this case it caused Ostrem substantial prejudice and deprived him of due process.[6] We find Ostrem's arguments unpersuasive.

Case law and the Minnesota Rules of Criminal Procedure clearly provide the trial court with discretionary authority to determine whether to amend a complaint. The applicable rule of criminal procedure provides:

The court may permit an indictment or complaint to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

Minn.R.Crim.P. 17.05. Additionally, we have held that "[T]he matter of allowing amendments to complaints under Minn.R.Crim.P. 17.05 is in the sound discretion of the trial judge." *Gerdes v. State,* 319 N.W.2d 710, 712 (Minn.1982).

■ A two-step process is used to determine whether Minn.R.Crim.P. 17.05 properly authorized the trial court's actions in this case. First, we look to whether the aiding and abetting instruction constituted charging Ostrem with an "additional or different offense." Minn.R.Crim.P. 17.05. It is undisputed that aiding and abetting is not a separate substantive offense. *See State v. Britt,* 279 Minn. 260, 263–65, 156 N.W.2d 261, 263–64 (1968); *State v. Alexander,* 290 Minn. 5–10, 185 N.W.2d 887, 890 (1971); *State v. Ortlepp,* 363 N.W.2d 39, 45 (Minn.1985). Furthermore, we have previously held that a jury may convict the defendant of aiding and abetting despite the absence of "aiding and abetting" language in the complaint. *State v. Lucas,* 372 N.W.2d 731, 740 (Minn.1985). In *State v. DeFoe,* 280 N.W.2d 38, 40 (Minn. 1979), a case of striking similarity, we affirmed the conviction of a defendant for aggravated robbery based on an aiding and abetting theory even though Minn.Stat. § 609.05 was not specifically mentioned in the complaint. Similarly, in the present case, because aiding and abetting is not a separate or additional charge to the second-degree burglary and theft charges, the instruction did not violate the first element of Minn.R.Civ.P. 17.05.

---

5. We note that, although the trial court and the parties refer to the statute as "aiding and abetting," in fact the word "abet" was not used as a part of Minn.Stat. § 609.05 when it was adopted in 1963, but instead "advises" was used. According to the Advisory Committee comments, "'abet' * * * adds nothing to what is already provided," presumably because the dictionary defines "abet" as nearly synonymous with "aid." *See Black's Law Dictionary* 17 (4th ed. 1968). We have previously held that "aiding and advising" is more descriptive and is the correct phrase for the offense covered by the statute. *Matter of Welfare of M.D.S.,* 345 N.W.2d 723, 733 n. 5 (Minn.1984). Nonetheless, subsequent cases refer to the statute as "aiding and abetting." *See, e.g., State v. Lucas,* 372 N.W.2d 731, 740 (Minn. 1985); *State v. Ortlepp,* 363 N.W.2d 39, 45 (Minn.1985); *State v. Campbell,* 367 N.W.2d 454, 460 (Minn.1985); *State v. McKenzie,* 532 N.W.2d 210, 222 (Minn.1995); *State v. Pierson,* 530 N.W.2d 784, 788 (Minn.1995).

6. We do not conclude that adding an aiding and abetting instruction constitutes an amendment to the complaint. However, for purposes of responding to Ostrem's argument, we will treat the trial court's action as such an amendment.

■ Ostrem's argument also fails the second prong of the test because his "substantial rights" were not prejudiced by the trial court's instructions. Ostrem argues that his due process rights were violated because the aiding and abetting instructions deprived him of an opportunity to prepare an effective defense, and the court of appeals concluded that the instruction gave the appearance of favoritism toward the prosecution. *Ostrem,* 520 N.W.2d at 429. We do not agree.[7] In *Gerdes* we stated the applicable standard:

> Upon careful review of Rule 17.05, we find that in order to prejudice the substantial rights of the defendant, it must be shown that the amendment either added or charged a different offense.

*Gerdes,* 319 N.W.2d at 712. As noted above, aiding and abetting does not constitute a separate or different charge; thus under *Gerdes,* Ostrem's substantial rights were not prejudiced. Furthermore, in *DeFoe* we held:

> Here, while the [aiding and abetting] statute was not cited in the complaint, the complaint made it clear that defendant was being charged with aggravated robbery, and the reports and statements attached to the complaint made it clear what the state basically contended had happened. There is therefore no possibility that defendant was confused as to the nature of the charges.

*DeFoe,* 280 N.W.2d at 40. Finally, it is particularly difficult to find any prejudice in this case, where Ostrem's entire defense rested on the alibi theory that he was at home with his wife.[8] Thus, the trial court's instruction does not violate the second element of Minn.R.Crim.P. 17.05. In sum, an additional or different offense was not charged and the substantial rights of Ostrem were not prejudiced. Therefore, the trial court did not abuse its discretion in giving the aiding and abetting instruction.

■ Finally, we must determine whether there is sufficient evidence in the record to sustain Ostrem's convictions of aiding and abetting second-degree burglary and aiding and abetting theft. We view the evidence in the light most favorable to the verdict when determining whether the jury acted with due regard for the presumption of innocence and for the need to overcome it by proof beyond a reasonable doubt. *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994). Furthermore, a conviction based on circumstantial evidence will be upheld and such evidence is entitled to as much weight as any other kind of evidence, so long as a detailed review of the record indicates that the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *Id.; State v. Scharmer,* 501 N.W.2d 620, 622 (Minn.1993). Inconsistencies in the state's case or possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable. *State v. Anderson,* 379 N.W.2d 70, 78 (Minn.1985). Thus, to succeed in a challenge to a verdict based on circumstantial evidence, a convicted person must point to evidence in the record that is consistent with a rational theory other than guilt. *Steinbuch,* 514 N.W.2d at 798–99; *State v. Race,* 383 N.W.2d 656, 662 (Minn. 1986). Furthermore, the jury is free to question a defendant's credibility, and has no obligation to believe a defendant's story. *Steinbuch,* 514 N.W.2d at 800; *see also State v. Bliss,* 457 N.W.2d 385, 390 (Minn.1990).

■ In the present case, Ostrem was convicted of aiding and abetting second-degree burglary and aiding and abetting theft.[9]

---

7. It is unclear how the instruction could be said to give "the appearance of favoritism toward the prosecution" when the trial court did not actually dismiss the charges of burglary and theft, nor were the jurors informed about the elements of burglary and theft until the close of evidence, when the trial court put the original charges in the context of aiding and abetting. In this context, it is unlikely that the jurors would have perceived any favoritism to the prosecution upon hearing the court's instructions.

8. The record indicates that during a chambers discussion concerning the jury instructions, Ostrem's counsel was unable to articulate how Ostrem would be prejudiced by the trial court's decision to submit the case to the jury under an aiding and abetting theory.

9. Minn.Stat. § 609.582, subd. 2 (1994) provides:

> Whoever enters a building without consent and with intent to commit a crime, * * * commits burglary in the second degree and may be

The court of appeals concluded that the state's evidence at most showed mere presence and inaction, and was legally insufficient to establish that defendant intentionally participated in the crimes. *Ostrem*, 520 N.W.2d at 431. The relevant portion of the aiding and abetting statute provides:

A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

Minn.Stat. § 609.05, subd. 1 (1994). To impose liability under the aiding and abetting statute, the state must show "some knowing role in the commission of the crime by a defendant who takes no steps to thwart its completion." *State v. Merrill*, 428 N.W.2d 361, 367 (Minn.1988) (citing *State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984)). Mere presence at the scene of a crime does not alone prove that a person aided or abetted, because inaction, knowledge, or passive acquiescence does not rise to the level of criminal culpability. *State v. Russell*, 503 N.W.2d 110, 114 (Minn.1993). Nevertheless, active participation in the overt act which constitutes the substantive offense is not required, and a person's presence, companionship, and conduct before and after an offense are relevant circumstances from which a person's criminal intent may be inferred. *Russell*, 503 N.W.2d at 114 (citing *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981)); *Matter of Welfare of M.D.S.*, 345 N.W.2d 723, 733 (Minn.1984). Thus, we must determine if the evidence was sufficient to support both elements: 1) Ostrem's presence at the farmhouse; and 2) Ostrem's "knowing role" in the burglary and theft.

■ Although the record contains evidence of two different factual scenarios, after a detailed review of the record, we are convinced that there was sufficient evidence to establish Ostrem's presence at the farmhouse. At trial, Ostrem argued that he was at home with his wife when the crime was committed and introduced the following evidence to support his theory: 1) Boomgaarden's testimony, which consistently maintained that Ostrem was not with him and Weyker at the farmhouse; 2) Ostrem's testimony that he was not at the farmhouse; and 3) Ostrem's sister's testimony that she spoke with Ostrem on the telephone at approximately 10:30 on the morning of the crime. By contrast, the state's theory that Ostrem was present at the farmhouse was supported by the following evidence: 1) Kevin Schroeder's accurate description of the two men he saw on the deck; 2) Kevin Schroeder's positive out-of-court photo identification of both Ostrem and Boomgaarden; 3) Kevin Schroeder's testimony at trial, including a positive in-court identification of Ostrem; 4) Deputy Thompson's testimony of the investigation and arrest of Ostrem; 5) testimony from Boomgaarden and Ostrem concerning their relationship with each other and with Weyker; and 6) impeachment of Boomgaarden's testimony. After determining the weight and credibility of all the evidence, the jury disbelieved Ostrem's alibi defense and concluded he was present at the farmhouse. Viewing all the evidence in the light most favorable to the state, it appears a reasonable jury could conclude Ostrem was at the farmhouse during the crime.

■ Next we must determine whether the state presented sufficient evidence to allow the jury to reasonably infer not only that Ostrem was not merely present at the farmhouse, but also that he played some knowing role in the crime.[10] We have previously held

---

sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000 or both * * *.

Minn.Stat. § 609.52, subd. 2(1) (1994) provides: Whoever does any of the following commits theft and may be sentenced as provided * * *: (1) intentionally and without claim of right takes, uses, transfers, conceals or retains possession of movable property of another without the other's consent and with intent to deprive the owner permanently of possession of the property * * *.

**10.** We note that if Ostrem could point to evidence in the record that is consistent with a rational explanation for his presence other than participation in the crime, then there would be insufficient circumstantial evidence to sustain the convictions. *See Steinbuch*, 514 N.W.2d at 799. However, because Ostrem relied exclusively on an alibi defense, there is no evidence in the record supporting any rational alternative to the state's theory for Ostrem's presence at the farmhouse.

that a person's presence can be sufficient to impose liability if it somehow aids the commission of the crime. *State v. Parker*, 282 Minn. 343, 355–56, 164 N.W.2d 633, 641 (1969); *State v. Garretson*, 293 N.W.2d 44, 45 (Minn.1980). Our analysis in *Parker* of the circumstances in which "presence" constitutes "aiding and abetting" is particularly instructive:

> In the instant case defendant was present during the criminal activity. He did nothing to prevent the offenses committed or the brutal beating which the victim endured. He must have known of the robbery and made no effort to stop it, and we think, under the circumstances, his presence and acts helped to make all the crimes possible.
>
>  \*  \*  \*  \*  \*  \*
>
> [I]f the proof shows that a person is present at the commission of a crime without disapproving or opposing it, it is competent for the jury to consider this conduct in connection with other circumstances and thereby reach the conclusion that he assented to the commission of the crime, lent to it his approval, and was thereby aiding and abetting its commission. Certainly mere presence on the part of each would be enough if it is intended to and does aid the primary actors.
>
>  \*  \*  \*  \*  \*  \*
>
> 'Once a reasonable inference arises, however, from all the circumstances that defendant was a participant[,] \* \* \* defendant's guilt is sufficiently established. This inference is a fact question for jury determination \* \* \*.'

*Parker*, 282 Minn. at 355–56, 164 N.W.2d at 641 (quoting *State v. Bellecourt*, 277 Minn. 163, 152 N.W.2d 61 (1967)). Similarly, in *State v. Merrill*, 428 N.W.2d at 367, the appellant argued that, although he participated in the burglary and aggravated robbery and was present when the victim was killed, the evidence was insufficient under Minn. Stat. § 609.05 to establish his intentional participation in the murder. We rejected this argument and distinguished between the type of "presence" in *Merrill* and the type of "presence" in *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981): [11]

> Appellant contends, however, that more than his mere presence at the scene is necessary to establish the level of activity required of one who aids and abets in the commission of a crime. For this premise, he relies primarily on *Ulvinen*, where the court construed section 609.05, subdivision 1 as requiring 'conduct that encourages another to act.' \* \* \* Significantly, in *Ulvinen*, all of the defendant's actions were taken *after* the crime had been completed. \* \* \* Appellant was clearly more than an innocent bystander who assisted [the principal] only after the killing was completed. \* \* \* His involvement in the circumstances here is much greater and more extensive than was the defendant's in *Ulvinen*.

*Merrill*, 428 N.W.2d at 367–68 (citations omitted). We concluded in *Merrill* that the state meets its burden by showing some knowing role in the commission of the crime by a defendant who takes no steps to thwart its completion. *Id*. at 367; *see also Russell*, 503 N.W.2d at 114.

■ In the present case, the state introduced substantial evidence placing Ostrem at the farmhouse during the commission of the crime and establishing his long term association with Boomgaarden and Weyker, who also were charged with second-degree burglary and theft. There is convincing evidence indicating not only that Ostrem was at the farmhouse while the crime was being committed, but also that he did nothing to "thwart its completion" and in fact, when confronted by Kevin Schroeder at the farmhouse, Ostrem passively condoned Boom-

---

**11.** In *Ulvinen*, the defendant was asleep downstairs when her son killed his wife. 313 N.W.2d at 426. After the killing, her son woke her and asked her to keep his children out of the bathroom while he dismembered his wife's body. *Id*. The defendant later helped clean up the blood and lied to investigators to protect her son. *Id*. Earlier, her son had told the defendant that he intended to kill his wife and she had done nothing to prevent the killing. *Id*. at 427. Although defendant's acts were found to be "morally reprehensible," her conviction for murder was reversed because something more than mere inaction is required to impose accomplice liability under the statute. *Id*. at 428.

gaarden's efforts to cover up the crime. Overall, looking at all the evidence and reasonable inferences in a light most favorable to the state, and considering our holdings in *Parker* and *Merrill*, it appears a reasonable jury could infer that Ostrem's presence constituted aiding and abetting.

We reverse the court of appeals' decision on all three grounds and reinstate Ostrem's convictions for aiding and abetting second-degree burglary and theft.