STATE OF MINNESOTA

IN SUPREME COURT

A13-1494

Hennepin County                                                          Dietzen, J.

State of Minnesota,

        Respondent,

vs.                                                                      Filed:  September 24, 2014
                                                                         Office of Appellate Courts

Eddie Matthew Mosley,

        Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Bridget Kearns Sabo, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court did not abuse its discretion in admitting a witness's in-court identification of appellant because the testimony did not violate appellant's due process rights and was relevant and not unfairly prejudicial.

2.      The district court did not abuse its discretion in excluding appellant's proposed expert testimony on the problems with eyewitness identification because the

1

proffered testimony would not be helpful to the trier of fact, and other safeguards were present to protect appellant against unreliable in-court identification testimony.

3.     Appellant's claims of prosecutorial misconduct lack merit.

Affirmed.

O P I N I O N

DIETZEN, Justice.

Appellant Eddie Matthew Mosley was indicted by a Hennepin County grand jury on three counts of first-degree premeditated murder, three counts of first-degree felony murder (burglary of an occupied dwelling), and three counts of first-degree felony murder (burglary while possessing a firearm), arising out of the shooting deaths of DeLois Brown, James Bolden, and Clover Bolden. Following a bench trial, Mosley was convicted of three counts of first-degree premeditated murder, and the district court imposed three consecutive life sentences without the possibility of release. On direct appeal, Mosley argues that the erroneous admission of an in-court identification, the exclusion of his proposed expert testimony on eyewitness identification, and prosecutorial misconduct deprived him of a fair trial. We affirm Mosley's convictions.

This case involves the murder of DeLois Brown and her parents, Clover and James Bolden. Brown and her daughter, W.H., lived in Minnesota. W.H. is the half-sister of Mosley. Mosley lived in St. Louis, Missouri, but occasionally traveled to Minnesota to see W.H. and her family. When Mosley travelled to Minnesota, he stayed with W.H. or Brown, and Brown treated him as a son.

2

Brown ran a licensed daycare from her home on College Park Drive in Brooklyn Park. Brown's parents, Clover and James Bolden, moved into the house in March 2012 so that Brown could help care for them. Mosley had been to Brown's home many times and was familiar with the family's daily routine, which included W.H. dropping her children off at Brown's residence around 6:15 a.m. in order to get to work on time.

On April 9, 2012, the Boldens and Brown were found shot to death in Brown's house. Following a police investigation, Mosley was indicted on three counts of first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2012), three counts of first-degree felony murder (burglary of an occupied dwelling), in violation of Minn. Stat. §§ 609.185(a)(3), .582, subd. 1(a) (2012), and three counts of first-degree felony murder (burglary while possessing a firearm), in violation of Minn. Stat. §§ 609.185(a)(3), .582, subd. 1(b) (2012). Mosley waived his right to a jury trial, and the district court held a bench trial.

At trial, the State presented evidence that in November 2011, W.H. reported to police that her daughter had been sexually molested by Mosley. On April 3, 2012, a criminal complaint charging Mosley with first-degree criminal sexual conduct was mailed to his residence in St. Louis. On April 5, 2012, W.H. received 25 phone calls and 13 text messages from Mosley in which he stated, among other things, that "30 years . . . that's life," "we family sis this not the way," and asked W.H. to make the charges go away.

M.T., a long-time friend of Mosley, testified that three days later Mosley asked him to take a trip to Minnesota, and M.T. agreed. They left St. Louis in the early evening

3

of April 8, 2012, in Mosley's black sports utility vehicle (SUV) on a trip to Minnesota. Mosley did all the driving on the trip and gave M.T. cash to pay for the gas. Mosley did not leave the SUV during the trip.

Mosley and M.T. arrived in Brooklyn Park in the early morning hours of April 9, 2012, and parked the SUV in a residential neighborhood near Brown's residence. M.T. testified that Mosley changed his clothes, put on a grey hooded sweatshirt with stripes down the arm, and then retrieved a bicycle from the SUV. Mosley told M.T. to purchase coffee and cigarettes and then meet him back where they had parked. As M.T. drove to a nearby gas station, he saw Mosley pedal the bicycle in the direction of a nearby store parking lot. Brown's residence was located two blocks northeast of the store. At about 6 a.m., a garbage truck driver observed an African-American male wearing a grey hooded sweatshirt take a bicycle out of a SUV near the residential neighborhood in which Mosley had parked. Video surveillance from the store confirmed the driver's testimony that the person then bicycled out of the neighborhood and toward the store. Surveillance from the gas station confirmed M.T.'s testimony that he drove the SUV to the gas station around 6:07 a.m. and left at 6:14 a.m.

A daycare parent testified that when she dropped her child at Brown's home that morning, she observed an African-American male wearing a sweatshirt with a grey hood and stripes over the shoulders riding a bicycle in front of Brown's house. As the parent was driving away, she noticed that the male had changed direction and was pedaling toward Brown's house. The parent called Brown to alert her that a suspicious male was in her neighborhood. During the phone call, she heard Brown say, "Hey you stop!" and

4

then the phone went dead. The parent drove back to Brown's house, noticed a bicycle lying on the ground in front of the house, and dialed 911. While speaking with the 911 dispatcher, the parent saw the male with the hooded sweatshirt come out of Brown's house, stuff something into his clothes, get on the bicycle, and ride across Brown's front yard onto the street.

The daycare parent followed the male on the street in her car until he turned around and looked directly at her and then rode over a berm and into the store parking lot. The parent returned to Brown's house and found Brown and the Boldens dead in an upstairs bedroom.[1] The store surveillance video confirmed that at about 6:30 a.m. a person rode a bicycle from the store parking lot, crossed the parking lot, and then traveled toward the residential neighborhood where Mosley had instructed M.T. to meet him. Two other witnesses who were driving to work at approximately 6:30 that morning observed a male wearing a dark-colored hooded sweatshirt riding a bicycle in the same residential neighborhood.

Mosley returned to the designated location, put the bicycle in the SUV, and sat in the driver's seat. M.T. noticed that Mosley had blood on his face and asked Mosley what had happened. Mosley, who was wearing black leather gloves over blue rubber gloves, responded, "I f---ed up," and placed a 9mm handgun on the center console.

---

[1] The medical examiner who performed the autopsies of all three victims determined that each victim had been shot twice in the head at close range and that these wounds had caused their deaths.

During the return trip to St. Louis, M.T. observed Mosley dispose of various items of evidence. When they stopped for gas, Mosley instructed M.T. to purchase orange juice and a map, and then Mosley poured out the orange juice and had M.T. fill the bottle with gas. At a different gas station, Mosley used the gas to burn his clothes, shoes, and gloves. Investigators later located the remains of some of the burned material near a dumpster. M.T. saw Mosley flick ammunition out of his window, try to break the gun apart using a wooden-handled hammer, and then throw the gun into a river. Mosley also wiped down the bicycle and left it in a grassy area near another gas station. During a search of Mosley's vehicle, investigators found a wooden-handled hammer and four blue latex gloves. The State introduced cell tower records to show that M.T.'s cell phone travelled between St. Louis and Brooklyn Park on the dates in question.

The defense presented an alibi witness who testified that he saw Mosley at a family party in St. Louis on the night of April 8, 2012. Two women who lived with Mosley testified, however, that they did not see Mosley or his SUV from the evening of April 8, 2012, until later in the day on April 9, 2012. Additionally, the defense introduced cell phone records to establish that Mosley's cell phone did not leave the St. Louis area during the relevant time period. Specifically, Mosley's cell phone records showed that a call was made from his cell phone in St. Louis to one of the women on April 9, 2012, at 11:42 a.m. This woman testified, however, that she did not speak to Mosley at that time. The State argued that Mosley's cell phone was available to anyone who lived with him in St. Louis.

After trial, the district court filed findings of fact and conclusions of law, which found Mosley guilty of all nine counts of first-degree murder. Mosley was convicted of three counts of first-degree premeditated murder and sentenced to three consecutive terms of life imprisonment without possibility of release. This direct appeal followed.

On appeal, Mosley argues that he is entitled to a new trial because (1) the district court erred in admitting the daycare parent's in-court identification of him; (2) the district court erred in excluding his proposed expert testimony regarding the problems with eyewitness identification; and (3) the prosecutor committed misconduct.

I.

Mosley first argues that the district court erred in admitting, over his objection, the daycare parent's in-court identification of him on the ground that it violated his right to due process. According to Mosley, the in-court identification of him was the product of an unnecessarily suggestive environment that deprived him of a fair trial. Additionally, Mosley argues that the identification testimony should have been excluded under Minn. R. Evid. 403 because the testimony lacked reliability and was unfairly prejudicial. We will address each argument in turn.

A.

We must first determine whether the admission of the in-court eyewitness identification violated Mosley's right to due process. If the evidence was erroneously admitted in violation of Mosley's constitutional right to due process, we then review whether the constitutional violation was harmless. *See State v. Ferguson*, 804 N.W.2d 586, 590 (Minn. 2011).

7

Recently, the United States Supreme Court considered whether the admission of eyewitness identification testimony violated a defendant's due process rights when the identification was made under suggestive circumstances not arranged by law enforcement officers. *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716, 722 (2012). The Court held that eyewitness identification testimony only implicates a defendant's due process rights when the identification of the defendant by the witness was *arranged by law enforcement* under unnecessarily suggestive circumstances. *Id.* at __, 132 S. Ct. at 730. Because the eyewitness identification at issue in *Perry* was not arranged by law enforcement—the eyewitness had spontaneously identified the defendant who was standing in a parking lot—the Court concluded that the admission of the identification at trial, "without a preliminary judicial assessment of its reliability," did not violate the defendant's right to due process. *Id.* at __, 132 S. Ct. at 722, 730.

In this case, the daycare parent testified on direct examination that she saw an African-American male wearing a grey hooded sweatshirt bicycling towards Brown's house on the morning of the murders; and that she saw the same man come out of Brown's house, get back on the bicycle, and pedal down the street and over a berm leading to a store parking lot. During the morning recess, the daycare parent approached a witness advocate from the Hennepin County Attorney's Office and told her that she recognized Mosley as the person she had seen on the bicycle. When her testimony resumed, the prosecutor asked the daycare parent if she recognized Mosley, and she responded that Mosley was the person she had seen on the bicycle on the morning of the murders. She stated: "I saw his profile on different occasions. And then I saw him

8

looking at me. And [Mosley] was the person I saw." Further, she stated that she recognized Mosley "[t]he minute [she] walked into the court[room]" and that she was 98 percent sure that Mosley was the man she had seen.

We conclude that Mosley's due process claim lacks merit. The daycare parent spontaneously identified Mosley the moment she walked into the courtroom without any involvement by law enforcement. The State did not show her a picture of Mosley or ask her to identify Mosley prior to trial. Because the State did not arrange the witness's identification of Mosley, the admission of the identification did not violate Mosley's due process rights.

B.

Mosley next argues that the in-court identification testimony should have been excluded under Minn. R. Evid. 403 on the ground that it lacked reliability and was unfairly prejudicial. Mosley failed to object to the identification testimony on the ground that the testimony should have been excluded under Rule 403, and therefore Mosley forfeited the right to raise the issue on appeal, subject to the application of the plain-error doctrine.[2] *See State v. Goodloe*, 718 N.W.2d 413, 420 (Minn. 2006). Under the plain-

---

[2] Mosley objected to the identification testimony only on the ground that it violated his due process rights. But to properly preserve a claim that evidence should be excluded under the Minnesota Rules of Evidence, a defendant must "timely object[]" and "state[] the *specific ground* of objection." Minn. R. Evid. 103(a)(1) (emphasis added). Because the specific ground for Mosley's objection did not include Rule 403, we review Mosley's claim for plain error. *See State v. Brown*, 792 N.W.2d 815, 820 (Minn. 2011) ("We are unable to determine the specific ground for the objection from the context and, therefore, analyze whether the district court erred in admitting Brown's omnibus-hearing statement under a plain-error analysis.").

error doctrine, an appellant may be entitled to a new trial provided that he establishes there was (1) an error; (2) that is plain; and (3) the error must affect substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If the appellant satisfies the first three prongs of the plain-error doctrine, "we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)); *accord State v. Bahtuoh*, 840 N.W.2d 804, 811 (Minn. 2013).

To satisfy the first prong of the plain-error doctrine, Mosley must establish an error, which is a "[d]eviation from a legal rule . . . unless the rule has been waived." *United States v. Olano*, 507 U.S. 725, 732-33 (1993). Here, the legal rule at issue is Minn. R. Evid. 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice. Because such a determination is within the discretion of the district court, Mosley must show that the district court abused its discretion in admitting the challenged testimony to satisfy the first prong of the plain-error doctrine. *See State v. Hayes*, 826 N.W.2d 799, 807-08 (Minn. 2013); *State v. Schulz*, 691 N.W.2d 474, 477 (Minn. 2005).

Generally, evidence is relevant and has probative value when it logically tends to prove or disprove a material fact in issue. *Schulz*, 691 N.W.2d at 478 (citing *State v. Lee*, 282 N.W.2d 896, 901 (Minn. 1979)). Rule 403 "favors admission of relevant evidence, as the probative value of the evidence must be 'substantially' outweighed by prejudice." *Schulz*, 691 N.W.2d at 478. We have explained that the term "prejudice" in Rule 403 "does not mean the damage to the opponent's case that results from the legitimate

probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Cermak*, 365 N.W.2d 243, 247 n.2 (Minn. 1985) (citation omitted) (internal quotation marks omitted); *see Schulz*, 691 N.W.2d at 479 (concluding that incriminating voicemail message "had a devastating impact on the defendant's case" but there was no support in the record that the evidence gave the State an unfair advantage).

Mosley relies on *State v. Ostrem*, 535 N.W.2d 916 (Minn. 1995),[3] to argue that the daycare parent's identification testimony should have been excluded under Rule 403 on the ground that it lacked reliability. Specifically, Mosley relies on a five-factor reliability test that we used in *Ostrem* to analyze a claim that unnecessarily suggestive identification testimony violated the defendant's due process rights.[4] *Ostrem*, 535 N.W.2d at 921. But we have never used the *Ostrem* reliability test to determine whether eyewitness identification testimony is admissible under Rule 403. Instead, we have repeatedly concluded that the reliability of identification testimony goes to the *weight* to be afforded

---

[3]    This case does not require us to determine what effect, if any, *Perry* has on the five-factor test expressed in *Ostrem*. *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716 (2012).

[4]    These five factors are:

1. The opportunity of the witness to view the criminal at the time of the crime;
2. The witness' degree of attention;
3. The accuracy of the witness' prior description of the criminal;
4. The level of certainty demonstrated by the witness at the photo display;
5. The time between the crime and the confrontation.

*Ostrem*, 535 N.W.2d at 921.

11

the testimony by the trier of fact, not to its *admissibility*. *E.g.*, *State v. Otten*, 292 Minn. 493, 494, 195 N.W.2d 590, 591 (1972) (" 'The factors affecting the reliability of eyewitness testimony, such as time for observation and circumstances under which the observation was made, go to the weight to be accorded the testimony, not to its admissibility.' " (quoting *State v. Senske*, 291 Minn. 228, 230, 190 N.W.2d 658, 660 (1971))); *accord State v. Farmer*, 179 Minn. 516, 518, 229 N.W. 789, 790 (1930). *Ostrem* did not consider the admissibility of the identification under Rule 403. As a result, the *Ostrem* reliability test, 535 N.W.2d at 521, does not apply when determining whether evidence should be excluded under Rule 403.

We conclude that the district court did not abuse its discretion under Rule 403 by admitting the daycare parent's in-court identification testimony. The testimony was relevant to prove the identity of the shooter and to prove Mosley's guilt, and the probative value of the identification testimony was not substantially outweighed by unfair prejudice. *See* Minn. R. Evid. 403. The testimony of an eyewitness that the accused is the person who committed the crime is a legitimate means of proving a defendant's guilt. *See State v. Sutton*, 272 Minn. 399, 401, 138 N.W.2d 46, 47 (1965) ("The law is clear. Opinion evidence is admissible as proof that an accused is the person who committed the offense."). Any details affecting the reliability of the testimony, such as the opportunity of the witness to observe the defendant at the time in question, go to the weight the trier of fact should give to the testimony, not to its admissibility.

Consequently, we reject Mosley's argument that the daycare parent's identification testimony should have been excluded under Rule 403. Mosley's claim fails

to satisfy the first prong of the plain-error test, and it is thus not necessary for us to consider the remaining prongs of the plain-error doctrine. *See Hayes*, 826 N.W.2d at 808.

## II.

Mosley argues that the district court abused its discretion, and violated his constitutional right to present a complete defense, by excluding his proposed expert testimony regarding the problems with eyewitness identification. A criminal defendant has the constitutional due process right to call and examine witnesses, including expert witnesses, subject to the limitations imposed by the rules of evidence. *State v. Hanks*, 817 N.W.2d 663, 667 (Minn. 2012). Rulings concerning the admission of expert testimony generally rest within the sound discretion of the district court and will not be reversed absent a clear abuse of discretion. *Id.*; *see also State v. Anderson*, 789 N.W.2d 227, 234-35 (Minn. 2010).

Minnesota Rule of Evidence 702 governs the admission of expert testimony. It provides, in part, that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Minn. R. Evid. 702. Under this rule, expert testimony is admissible if, among other things, it is helpful to the trier of fact. *State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011).

We have addressed the admissibility of expert testimony regarding the accuracy of eyewitness identifications in several cases. *E.g.*, *State v. Miles*, 585 N.W.2d 368

(Minn. 1998); *State v. Helterbridle*, 301 N.W.2d 545 (Minn. 1980). In *Helterbridle*, we concluded that whether to admit expert testimony regarding eyewitness identification was within the discretion of the district court. 301 N.W.2d at 547. We reasoned that there are a number of safeguards available to prevent convictions of the innocent based on unreliable eyewitness identification, and that these safeguards alleviate the need to *require* district courts to admit expert testimony on the issue. *Id.* The available safeguards include effective cross-examination, persuasive closing arguments, and jury instructions on the factors relevant to evaluating eyewitness identification testimony. *Id.*

In *Miles*, we again considered whether the district court had abused its discretion in excluding expert testimony regarding the accuracy of eyewitness identification. 585 N.W.2d at 371-72. We held that the district court did not abuse its discretion because many of the safeguards listed in *Helterbridle* were present. *Miles*, 585 N.W.2d at 372. Specifically, the defendant was not prosecuted until police had more than an eyewitness identification linking him to the crime; the jury members were queried during voir dire about the frailties of eyewitness identifications and were instructed by the district court on the factors to take into account when assessing eyewitness testimony; the eyewitnesses were all cross-examined as to the reliability of their testimony; and in closing arguments defense counsel urged the jury to view the identifications with skepticism. *Id.*[5]

---

[5] In three other cases we also affirmed the district court's decision to exclude expert testimony regarding the problems with eyewitness identifications. *State v. Barlow*, 541 N.W.2d 309, 313 (Minn. 1995); *State v. Saxton*, 331 N.W.2d 240, 242 (Minn. 1983); *State v. St. John*, 299 N.W.2d 737, 738 (Minn. 1980).

14

With these principles in mind, we turn to Mosley's proposed expert testimony. When the State rested, Mosley's counsel proffered the following expert testimony on eyewitness identification:

> He would testify to that the human mind is not like a recorder. We don't record things like you would a video and play it back. There are certain things that disrupt our memory. You know, as briefly covered by Detective Ryan, when someone is reaching for something, the lighting conditions, the ability to describe facial features, the suggestiveness of certain photos or potential displays . . . . And that is what is expected that expert would testify to.

Mosley's counsel acknowledged that the "unreliability" of the daycare parent's in-court identification would be part of its closing argument. The court offered Mosley the opportunity to recall and further cross-examine the daycare parent regarding her identification, but defense counsel declined the opportunity. The court subsequently denied Mosley's request to present expert testimony on eyewitness identification stating, "I don't believe that that expert can assist me in this trial or has anything to add."

We conclude that the district court did not abuse its discretion in excluding Mosley's proposed expert testimony for two reasons. First, Mosley did not establish that the proposed expert testimony would be helpful to the trier of fact. Mosley's proffer was very general and nonspecific to his case. Instead, the proffered testimony related only to how memory is fallible and eyewitness identification is unreliable. Notably, the proposed testimony did not go to the particular circumstances surrounding the daycare parent's perceptions on the morning of April 9, 2012, or the circumstances surrounding her in-court identification. *See State v. Barlow*, 541 N.W.2d 309, 313 (Minn. 1995) (concluding that a district court did not abuse its discretion in excluding expert testimony on the

15

problems with eyewitness identification where "the proffered testimony did not go to the reliability of any particular witness or the particular circumstances of the identification, and its potential for helpfulness was minimal at best").

Second, most of the safeguards listed in *Helterbridle* and *Miles* were present in this case to protect Mosley against unreliable in-court identification testimony. Specifically, the State charged Mosley with a crime and had substantial evidence of his guilt long before the daycare parent first identified him; defense counsel cross-examined the daycare parent, and the court gave Mosley an opportunity to recall the daycare parent and ask her further questions after the State had rested. Thereafter, defense counsel challenged the reliability of the daycare parent's identification testimony in closing arguments, arguing that the daycare parent was unable to identify to police any unique characteristics of the suspect, that she focused on what she thought to be a weapon in the suspect's hand and not his face, and that her testimony regarding the type of pants the suspect was wearing differed from another witness's account. The district court, acting as trier of fact, was presumably aware of the standard cautionary instruction on eyewitness identification testimony, 10 Minn. Dist. Judges Ass'n, *Minnesota Practice— Jury Instruction Guides, Criminal*, CRIMJIG 3.19 (5th ed. 2006).

Mosley argues, however, that the district court misapplied Rule 702's helpfulness standard by treating it as a subjective rather than an objective test. Specifically, Mosley contends that the district court failed to consider the admissibility of the expert testimony from an evidentiary standpoint, and instead considered its admissibility from a personal standpoint. It is true that the standard for assessing the helpfulness of proposed expert

testimony under Rule 702 is an objective standard. *See State v. Dao Xiong*, 829 N.W.2d 391, 396 (Minn. 2013) ("An expert opinion is helpful if the members of the jury, having the knowledge and general experience common to every member of the community, would be aided in the consideration of the issues by the offered testimony." (citation omitted) (internal quotation marks omitted)). Here, the district court applied the helpfulness test and concluded that the proffered expert testimony did not go beyond common knowledge and would not be helpful to the fact-finder.

In sum, the district court did not abuse its discretion in excluding Mosley's proposed expert testimony on the problems with eyewitness identifications. As a result, Mosley's right to present a complete defense was not infringed by the exclusion of the proposed expert testimony.

### III.

Finally, Mosley argues that he is entitled to a new trial because of prosecutorial misconduct in eliciting three types of inadmissible character evidence. Because Mosley did not object to the conduct at issue, we review the alleged prosecutorial misconduct under the modified plain-error test. *See State v. Ramey*, 721 N.W.2d 294, 299-300 (Minn. 2006); *State v. Martin*, 773 N.W.2d 89, 104 (Minn. 2009). Under that test, the defendant has the burden to demonstrate that the misconduct constitutes (1) error, (2) that is plain. *State v. Matthews*, 779 N.W.2d 543, 551 (Minn. 2010). An error is plain if it is clear or obvious; this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct. *Ramey*, 721 N.W.2d at 302. If plain error is established, the burden then shifts to the State to demonstrate that the error did not affect the

17

defendant's substantial rights. *Matthews*, 779 N.W.2d at 551; *Ramey*, 721 N.W.2d at 302. To meet the third prong, the State must show that there is "no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict." *Ramey*, 721 N.W.2d at 302 (citation omitted) (internal quotation marks omitted). If all three prongs of the test are met, "we may correct the error only if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

It is generally misconduct for a prosecutor to "knowingly offer inadmissible evidence for the purpose of bringing it to the jury's attention." *State v. Milton*, 821 N.W.2d 789, 804 (Minn. 2012) (citation omitted) (internal quotation marks omitted). But when evidence is admissible under the Minnesota Rules of Evidence, a prosecutor does not commit misconduct by introducing the evidence at trial. *See State v. Swaney*, 787 N.W.2d 541, 560-61 (Minn. 2010) (concluding a prosecutor did not commit misconduct by eliciting certain testimony because the evidence was relevant and admissible). We will separately examine Mosley's three arguments.

A.

Mosley argues that the prosecutor improperly elicited inadmissible character evidence that Mosley was likely a drug dealer. Specifically, he argues that the prosecutor elicited testimony from M.T. that Mosley was talking about drugs when they stopped at another residence prior to leaving St. Louis; and that when asked by the prosecutor why

18

he thought they were going to Minnesota, M.T. responded that he thought they were going to get drugs.

During M.T.'s direct examination, the State asked him where he met Mosley on April 8, 2012, prior to leaving for Minnesota. M.T. responded that they met at a mutual friend's house and that the conversation there was about "drugs." Later during direct examination, the State asked M.T. if he knew where Mosley was driving, and M.T. responded that he did not know, but that at some point during the drive he asked Mosley where they were going, and Mosley responded "sota," and that it was M.T.'s assumption that they were going to Minnesota to "get drugs."

Assuming without deciding the reference to drugs in M.T.'s direct examination was plain error, we conclude that the testimony did not affect Mosley's substantial rights. Although the testimony was largely irrelevant, it was very limited. Moreover, the other evidence that supported the conviction was overwhelming. This evidence included W.H.'s testimony regarding Mosley's motive; M.T.'s detailed testimony placing Mosley near the scene of the crime at the time of the murders, his testimony that Mosley returned with blood on his face, and that Mosley then disposed of various pieces of incriminating evidence during the journey back to St. Louis; the daycare parent's testimony that she saw Mosley on a bicycle in front of Brown's house and then saw him leave Brown's house moments before she discovered the bodies of the three victims; and the various surveillance videos and eyewitness testimony that corroborated M.T.'s and the daycare parent's accounts.

Mosley argues that the prosecutor improperly elicited testimony that he lived with and engaged in sexual relationships with three women; that the three women were all pregnant with Mosley's children; that Mosley did not have his own bedroom in his residence but slept in whatever room and with whichever girlfriend suited him at the time; and that there were several small children living at his residence. Mosley contends that this testimony constituted irrelevant character evidence "designed to paint Mosley as, at best, lecherous and irresponsible and, at worst, a criminal."

The State elicited testimony from T.W., one of the women that lived at Mosley's residence, regarding his domestic relationships and children. Later during T.W.'s direct examination, the State elicited testimony that the three women had their own bedrooms at Mosley's house and that Mosley stayed "wherever he wanted," sleeping in one bedroom one night and in another the next. The State elicited similar testimony from M.W., another woman who lived at Mosley's residence.

Mosley's defense was that he was in St. Louis and not in Brooklyn Park on the date in question. A witness testified for the defense that he saw Mosley at a family party in St. Louis on the evening of April 8, 2012, and that Mosely was still at the party when it was dark outside. The State responded with the testimony of T.W. and M.W. that they did not see Mosley on the evening of April 8 or the morning of April 9. The fact that Mosley slept in the women's rooms, and yet the two women did not see him during the time in question, was relevant to rebut Mosley's alibi defense.

Mosley also introduced evidence that his cell phone called one of these women on the morning of April 9 from St. Louis to establish that he was in St. Louis at the time. The evidence that multiple women and children lived at Mosley's residence was relevant to show that any of the individuals in the house could have made the call on Mosley's cell phone. Because the cell phone was not password protected, even the small children in the house could have made the call while playing with the phone.

On this record, it was not plain error for the prosecutor to elicit the testimony regarding Mosley's living arrangements and domestic relationships.

C.

Finally, Mosley argues that the prosecutor committed misconduct by introducing an exhibit containing Mosley's text messages. The exhibit in question contained 2,785 text messages sent or received by Mosley between October 17, 2011, and April 13, 2012. Mosley concedes that many of the messages are banal, but contends that some of the messages are sexually graphic and highly inflammatory.

The State contends that the exhibit is relevant to establish Mosley's motive. W.H. testified, and her phone records confirmed, that Mosley texted her 13 times on April 5, 2012, and she texted him 4 times. The messages from Mosley included "sis that's life in jail," and "we family sis this not the way." These messages reveal that Mosley was aware of the pending first-degree criminal sexual conduct charges filed against him, and he wanted W.H. to make them go away.

Even though W.H.'s phone records showed that she received 13 messages from Mosley on April 5, there were no messages recovered from Mosley's phone that were

21

either received from or sent to W.H. on April 5, 2012. The fact that none of the text messages between Mosley and W.H. were recovered from Mosley's phone indicates that he deleted them, which incriminated Mosley because the content of the messages went to his motive.

Although we conclude that the record of Mosley's text messages was clearly relevant to prove motive, we are nonetheless troubled that the prosecutor chose not to redact some of the messages. Specifically, some of the text messages contain graphic sexual references and possible references to prostitution. The content of all of Mosley's text messages was not necessary for the underlying purpose of proving that Mosley deleted the messages sent to and received from W.H.

Assuming without deciding that the State's failure to redact the content of some of Mosley's text messages constituted plain error, we conclude that the State has established that any error did not affect Mosley's substantial rights. When considering whether an error affected a defendant's substantial rights, "we consider 'the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions.' " *State v. Hohenwald*, 815 N.W.2d 823, 835 (Minn. 2012) (quoting *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007)).

Here, the evidence against Mosley was strong. Moreover, the prosecutor did not rely on the content of the inflammatory text messages. The State did not elicit any testimony regarding the content of Mosley's text messages. Instead, the State focused

exclusively on the relevant evidence from the exhibit—namely, that Mosley had deleted all texts from and to W.H. dated April 5, 2012.

Finally, the district court made detailed findings of fact and referenced significant evidence pointing to Mosley's guilt.  The court did not, however, reference any of the allegedly inadmissible character evidence.  Consequently, there is no reasonable likelihood that the content of the text messages had a significant effect on the judge's conclusion of guilt.  We therefore hold that Mosley is not entitled to a new trial based on alleged prosecutorial misconduct.

Affirmed.