*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0299**

State of Minnesota,
Respondent,

vs.

Rodney Allan Williams,
Appellant.

**Filed February 9, 2026
Reversed and remanded
Johnson, Judge**

Hennepin County District Court
File No. 27-CR-24-17485

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Britta Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Ross, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

A Hennepin County jury found Rodney Allan Williams guilty of fourth-degree criminal sexual conduct based on evidence that he touched a woman's breasts and other parts of her body without her consent. We conclude that the prosecutor plainly engaged in

misconduct by offering inadmissible and prejudicial character evidence. Therefore, we reverse and remand for a new trial.

**FACTS**

On August 1, 2024, at approximately 5:00 p.m., Z.A. called 911 to report that she had been held "hostage" in a home in Minneapolis since the previous evening by a man who attempted to force her to engage in sex with him. When officers responded to the call, Z.A. told them that she had gone to the man's home to buy drugs, as she had done in the past. She said that the man asked her to do a taste test of a batch of crack cocaine, which she did. The man later asked other guests to leave and told Z.A. that, because he had given her crack cocaine, she needed to do him a sexual favor. Z.A. also told the officers that the man had taken some of her possessions (including bags, a wallet, credit cards, and an identification card) and would not give them back.

During this initial conversation with police officers, Z.A. made statements that are not directly related to the alleged sexual assault, including the following: she said that the man "basically beats women up all the time" and that there are guns in his home.

Based on the address provided by Z.A., officers went to the man's home and found him outdoors. When the officers performed a show-up procedure, Z.A. recognized the man, later identified as Williams, as "the guy that kept me hostage." Officers searched Williams's home and found items belonging to Z.A.

The next day, a police investigator contacted Z.A. by telephone to ask follow-up questions. During the call, which was recorded, Z.A. made statements that are not directly related to the alleged sexual assault, including the following: she said that Williams and

2

other men who hang out at his home are "pimps" and that Williams and the other men "steal . . . IDs and credit cards."

The state charged Williams with fourth-degree criminal sexual conduct, in violation of Minn. Stat. § 609.345, subd. 1(a) (2024), and false imprisonment, in violation of Minn. Stat. § 609.255, subd. 2 (2024).

The case was tried to a jury on three days in October and November of 2024. The state called seven witnesses.

The state's first witness was Z.A., who testified as follows. On July 31, 2024, she went to Williams's home to buy drugs from him, as she had done before. Other persons were at Williams's home and using drugs that day. Williams offered her a taste of a batch of crack cocaine, which she tried. Williams told other guests to leave and told Z.A. to go to the basement. Z.A. attempted to find her belongings, but Williams locked the door to the basement to keep her "hostage." While the two of them were in the basement, Williams continually tried to get Z.A. to have sex with him. He touched her breasts and her groin area and "all over," under her clothes. Williams told Z.A. that she "would not be leaving that house without giving him sex." She was scared because Williams "said he was going to kill" her and she "knew there was guns in the house." When Williams occasionally left the basement, his nephew watched Z.A. and prevented her from leaving. Z.A. was able to escape the next day, when Williams "smoked so much weed [that he] fell asleep." Z.A. went outside, called 911, and ran away. Z.A. also testified that she had not used illegal drugs since August 5, 2024, four days after the incident.

3

During the testimony of four police officers, the state introduced unredacted body-worn-camera (BWC) videorecordings that depicted the officers' interactions with Z.A. after they responded to her 911 call. The state also introduced an audiorecording of the telephone interview of Z.A. on the day after the incident. While the audiorecording was played, jurors were given a written transcript of the telephone call to aid them in listening to the audiorecording.

During the second day of trial, deputies removed from the courtroom a man and a woman who had been sitting in the gallery behind Williams throughout the trial. According to the deputies, the two persons were "being disruptive on [their] phones, talking, and eating." The district court was not aware of the issue until after the persons had been asked to leave. Deputies later told the two persons that they could return to the courtroom so long as they followed the rules of decorum, but they did not return.

Later during the second day of trial, the prosecutor informed the district court that Z.A. had told the prosecutor's victim-witness advocate that she was "high" when she drove to court to testify. Both the prosecutor and the advocate attempted to bring Z.A. back to court so that she could testify further about that issue, but she was uncooperative. The district court found that Z.A.'s statement to the advocate was material because Z.A. had testified that she had not used illegal drugs since shortly after the incident. The state offered to call the victim-witness advocate to testify about her conversation with Z.A. The victim-witness advocate was called and testified about Z.A.'s statement about being high.

4

Williams did not testify. He called one witness, L.A., who testified that she saw Z.A. at Williams's home on three occasions, including August 1, 2024, but that she never saw anyone touch Z.A. in a sexual way, harm her, or threaten her.

The jury found Williams guilty of fourth-degree criminal sexual conduct but not guilty of false imprisonment. The district court imposed a sentence of 60 months of imprisonment and ordered a 10-year term of conditional release. Williams appeals.

## DECISION

Williams makes three arguments for reversal and a new trial. First, he argues that the district court erred by partially closing the courtroom during trial, in violation of his Sixth Amendment right to a public trial, when deputies told two persons in the gallery to leave the courtroom. Second, he argues that he received an unfair trial due to the admission of inadmissible and prejudicial character evidence, which he attributes to prosecutorial misconduct, district court error, and ineffective assistance of counsel. Third, he argues that the district court erred by not *sua sponte* declaring a mistrial after the state disclosed that Z.A. had admitted to being high on the morning of her testimony despite testifying that she had not used illegal drugs since shortly after the incident.

We begin by considering Williams's second argument because it is dispositive. He challenges the admission of six statements by Z.A., five of which are out-of-court statements. But one of the challenged statements was not actually admitted into evidence.[1]

---

[1]Williams challenges Z.A.'s statement during her courtroom testimony that she was "not the first person" to whom Williams had done "something like this." Williams objected, and the district court sustained the objection. The district court instructed the jury to disregard any testimony for which an objection is sustained.

Also, one of the six statements does not clearly refer to Williams.[2] Thus, we are concerned with the four remaining statements:

> (1)     Z.A.'s statement in a BWC videorecording that Williams "basically beats women up all the time."
>
> (2)     Z.A.'s statement in a BWC videorecording that she had seen guns in Williams's house.
>
> (3)     Z.A.'s statement in an audiorecording of the telephone interview by a police investigator that Williams and other men who hang out at his home are "pimps."
>
> (4)     Z.A.'s statement in an audiorecording of the telephone interview that Williams and the other men "steal . . . IDs and credit cards."

The parties agree that Williams did not object at trial to the four statements described above. Accordingly, we review for plain error. *See* Minn. R. Crim. P. 31.02. Under the plain-error test, an appellant is entitled to relief only if (1) there is an error, (2) the error is plain, and (3) the error affects the appellant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). An error is plain if it clearly or obviously contravenes caselaw, a rule, or a standard of conduct. *State v. Lilienthal*, 889 N.W.2d 780, 785 (Minn. 2017). If a prosecutor has engaged in plain misconduct, the plain-error test is modified to require the state to bear the burden with respect to the third requirement by establishing that the plain misconduct did not affect the defendant's substantial rights. *State v. Portillo*, 998 N.W.2d 242, 248, 251 (Minn. 2023); *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.

---

[2]Williams challenges Z.A.'s statements on a BWC videorecording that a man is a "fugitive" with an active warrant for his arrest. It appears that this statement refers to Williams's nephew, not Williams.

2006). If the first three requirements of the plain-error test are satisfied, an appellate court will provide appellate relief if necessary to ensure "the fairness, integrity, or public reputation of judicial proceedings." *Portillo*, 998 N.W.2d at 248 (applying modified plain-error test); *see also Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022) (applying unmodified plain-error test).

**1.**

We begin by considering whether there was an error. *See Portillo*, 998 N.W.2d at 248-50; *Griller*, 583 N.W.2d at 740.

Williams contends that the challenged statements are inadmissible for two reasons: first, because they are hearsay and, second, because they are other-acts evidence. *See* Minn. R. Evid. 404(b), 802. Williams also contends that it was prosecutorial misconduct for the prosecutor to offer inadmissible evidence. The right to due process includes the right to a fair trial, and prosecutors have an obligation to ensure a fair trial. *State v. Duol*, 25 N.W.3d 135, 141 (Minn. 2025); *State v. Jones*, 753 N.W.2d 677, 686 (Minn. 2008). "It is generally misconduct for a prosecutor to knowingly offer inadmissible evidence for the purpose of bringing it to the jury's attention." *State v. Mosley*, 853 N.W.2d 789, 801 (Minn. 2014) (quotation omitted).

With respect to the first challenged statement described above, the state contends that the statement is not hearsay on the grounds that Z.A. merely repeated a statement made by Williams and that the statement was not offered for the truth of the matter asserted. But there is no indication that Z.A. was repeating a statement made by Williams. Also, the state did not expressly offer the evidence for the limited purpose described in its appellate

7

brief. In addition, the state contends that rule 404(b) does not apply on the ground that the statement relates only to the allegations against Williams. But the statement refers to other women and other incidents. The state does not argue that the statement is admissible pursuant to any exception in rule 404(b).

With respect to the second, third, and fourth challenged statements, the state contends that the statements do not refer to Williams. But Z.A. said more than once that she had seen guns in Williams's home, which implicates Williams. Also, it is clear from the context that Z.A. referred to both Williams and other men who hang out at his home when she said that they are "pimps" and that they engage in theft. The state does not otherwise respond to Williams's argument that the challenged statements are inadmissible.

Thus, the four challenged statements are inadmissible. *See State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002) (concluding that district court erred by admitting evidence that appellant was "person of bad character"). Therefore, the prosecutor should not have offered the four challenged statements. *See Mosley*, 853 N.W.2d at 801 (stating that prosecutor engages in misconduct by knowingly offering inadmissible evidence).

**2.**

We continue by considering whether the prosecutor's misconduct and the district court's error were plain. *See Portillo*, 998 N.W.2d at 250-51; *Griller*, 583 N.W.2d at 740.

On several occasions, the appellate courts have made clear in precedential opinions that both prosecutors and district courts have a duty to ensure that audiorecordings and videorecordings do not contain inadmissible statements and, if they do, to ensure that they are edited or redacted before being offered and admitted. In *State v. Pearson*, 775 N.W.2d

8

155 (Minn. 2009), the supreme court concluded that the district court erred by admitting a videorecording that had not been redacted to remove a defendant's statement in which he exercised his right to counsel. *Id.* at 162. In *Mosley*, the supreme court considered an argument that the prosecutor engaged in misconduct by offering an exhibit depicting text messages without redacting irrelevant and prejudicial messages "contain[ing] graphic sexual references and possible references to prostitution." 853 N.W.2d at 802-03. The supreme court commented that it was "troubled that the prosecutor chose not to redact" the irrelevant and prejudicial messages. *Id.* at 803. In *State v. Noor*, 907 N.W.2d 646 (Minn. App. 2018), *rev. denied* (Minn. Apr. 25, 2018), this court concluded that the district court erred by admitting an unredacted document that stated that the defendant had been convicted of a crime. *Id.* at 656-657.

More recently, in *State v. Bigbear*, 10 N.W.3d 48 (Minn. 2024), the state offered and the district court admitted a videorecording in which the alleged victim of criminal sexual conduct called the defendant a "pedophile" and a "pervert." *Id.* at 53. The supreme court stated that "name-calling is character evidence excluded by the Minnesota Rules of Evidence because of its unfairly prejudicial impact." *Id.* at 57. The supreme court added:

> That the State offered this clearly inadmissible portion of the video without redaction in a case alleging sexual assault was a significant misstep. We expect prosecutors, when seeking admission of a prior consistent statement—and district courts when admitting such evidence—to be vigilant in excising unfairly prejudicial, extraneous material before it is played for the jury.

9

*Id.* In a separate opinion, the chief justice described "the State's . . . failure to redact the video interview to ensure that Bigbear received a fair trial" as "inexplicable." *Id.* at 62 (Hudson, C.J., concurring). In her concluding paragraph, the chief justice added that "the State abused its prosecutorial power by introducing the full 33-minute video." *Id.* at 62 (Hudson, C.J., concurring).

In light of these authorities, the prosecutor plainly engaged in misconduct by offering an unredacted audiorecording and unredacted videorecordings containing inadmissible character evidence and inadmissible hearsay, and the district court plainly erred by admitting such evidence.

**3.**

We continue by considering whether the plain misconduct and the plain error affected Williams's substantial rights. *See Portillo*, 998 N.W.2d at 251-55; *Griller*, 583 N.W.2d at 740. Because the modified plain-error test places the burden on the state with respect to the third requirement, we seek to determine whether the state has established that the plain prosecutorial misconduct did *not* affect Williams's substantial rights. *See Portillo*, 998 N.W.2d at 248, 251. To satisfy that burden, the state must "show that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* at 251 (quotation omitted). In considering that issue, an appellate court may consider "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *Id.* at 251-52 (quotation omitted).

10

First, Williams contends that the state's evidence is not strong enough to overcome the prejudicial effect of the challenged evidence. He asserts that the jury likely discredited Z.A.'s testimony, as indicated by the undisputed evidence that she lied in her testimony and the jury's acquittal on the false-imprisonment charge. The state's case depended on Z.A.'s credibility, but the state's own evidence shows that Z.A. lied on the witness stand and did not return to court to explain further. For this reason, the state's evidence is not strong enough to overcome the prejudicial effect of the challenged evidence.

Second, Williams contends that the challenged evidence was "presented in a highly dramatic manner" in videorecordings that showed Z.A. speaking in an excited and emotional way immediately after her 911 call. Williams also contends that Z.A. used strong words that made Williams appear to be a dangerous person with a "history of violence against women and a penchant for committing crimes." In response, the state contends that the challenged evidence consists of "fleeting references and passing comments, many of which were difficult to hear and understand." It is true that the recordings were of mediocre quality and contain much background noise. But jurors were given a written transcript of the audiorecording, in which two of the challenged statements were introduced, to aid them in listening to and understanding the audiorecording. The number, variety, and prejudicial nature of the challenged statements are significant, which makes it more likely that they had a significant impact on the jury.

Third, Williams contends that he could not have rebutted the inadmissible character evidence "without drawing extra attention to those claims." In response, the state contends that the challenged evidence was "countered" by Z.A.'s "multiple statements regarding

11

appellant's good character." But the state does not identify those purportedly favorable statements. Williams did not have an opportunity to cross-examine Z.A. about the challenged statements because the state introduced the audiorecording and the videorecordings after Z.A. testified. And we agree with Williams that it was not practical for his defense attorney to attempt to offer evidence that he does *not* "beat[] women up all the time," does *not* have guns in his house, is *not* a "pimp," and does *not* "steal . . . IDs and credit cards." Furthermore, it is notable that the district court gave the jury a cautionary instruction concerning the evidence that Williams engaged in "drug-related conduct" but did not give such an instruction related to the prejudicial character evidence Williams challenges on appeal. In *Portillo*, the supreme court reasoned that the district court's jury instructions "were not sufficient to remedy any prejudice the prosecutor's erroneous statement caused" because they "did not contradict or otherwise instruct the jury to ignore" the evidence admitted because of prosecutorial misconduct. *Id.* at 253-54. Consequently, Williams did not have an opportunity to rebut or alleviate the prejudicial effect of the challenged statements.

We note that the state refers to the standard, unmodified plain-error test and contends that Williams "has not carried his 'heavy burden' of establishing a reasonable likelihood that the alleged character evidence substantially affected the verdict." (Citing *Griller*, 583 N.W.2d at 741.) The state does not attempt to argue that it carried its burden on the third requirement of the modified plain-error test.

On balance, the state's evidence was not strong, the nature and likely impact of the challenged evidence is significant, and Williams did not have an opportunity to rebut or

12

alleviate the prejudicial effect of the challenged statements. The state has not satisfied its burden of showing that there is "no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *See Portillo*, 998 N.W.2d at 254.

Thus, a reasonable likelihood exists that plain prosecutorial misconduct had a significant effect on the jury's verdict and, accordingly, affected Williams's substantial rights. *See id.*

**4.**

We conclude by considering "whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *See Portillo*, 998 N.W.2d at 255 (quotation omitted).

In *Portillo*, the prosecutor engaged in plain misconduct by arguing to the jury that the defendant should not receive the benefit of the presumption of innocence. *Id.* at 248-51. The supreme court reasoned that the prosecutor's misstatement of the presumption of innocence implicated "bedrock" and "elementary" principles "whose enforcement lies at the foundation of the administration of our criminal law." *Id.* at 256 (quotations omitted). The supreme court reasoned further that such errors, if not corrected, "would also have a substantial and deleterious effect on future trials." *Id.*

The same can be said in this case. The supreme court emphatically has said that prosecutors must "be vigilant in excising unfairly prejudicial, extraneous material before it is played for the jury," *Bigbear*, 10 N.W.3d at 57, and the chief justice has said that a lack of such vigilance is an abuse of the prosecutorial power, *id.* at 62 (Hudson, C.J.,

13

concurring).  Accordingly, reversal and a new trial in this case is necessary to ensure the fairness and integrity of judicial proceedings.

Thus, Williams is entitled to a new trial because of plain prosecutorial misconduct. In light of that conclusion, we need not address Williams's first and third arguments for a new trial.

**Reversed and remanded.**